## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CARMEN RODRIGUEZ-CARDI, | |
| Plaintiff, | |
| v. | CIVIL NO. 14-1854 (PAD) |
| MMM HOLDINGS, INC., | |
| Defendant. | |

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Carmen Rodríguez-Cardi was employed with MMM Holdings, Inc. for ten months between 2013 and 2014.   MMM terminated her employment, and she initiated the present action complaining of (1) discrimination because of her age and retaliation for having complained of discriminatory practices in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. ("ADEA"), (2) age discrimination and retaliation under Puerto Rico's general antidiscrimination statute,  Law No. 100 of June 30, 1959, as amended, P.R. Laws Ann. tit. 29 §§ 146 *et seq*. ("Law 100"); and (3) unjust discharge in connection with Puerto Rico's Unjust Discharge Act, Law No. 80 of May 30, 1976, as amended, P.R. Laws Ann. Tit. 29 §§ 185a *et seq*. ("Law 80"); (4) .damages pursuant to Puerto Rico's general tort statute, Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141, 5142 (Docket Nos. 1 and 29).

Following a motion to dismiss, the court dismissed plaintiff's retaliation claim under the ADEA and Law 100 (Docket No. 21).  Before the court is MMM's "Motion for Summary Judgment and Memorandum of Law in Support Thereof" (Docket No. 41), seeking dismissal of the remaining claims.  Plaintiff opposed (Docket No. 53), and MMM replied (Docket Nos. 68 and

Carmen Rodríguez-Cardi v. MMM Holdings, Inc.
Civil No. 14-1854 (PAD)
Opinion and Order
Page 2

77).[1]  For the reasons that follow, the court GRANTS MMM's motion for summary judgment and dismisses the case.

## I.      STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The purpose of summary judgment is to pierce the pleadings and assess the proof in order to see whether there is need for trial.  Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991).

The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A factual dispute is "genuine" if it could be resolved in favor of either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  It is "material" if it potentially affects the outcome of the case in light of applicable law.  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

Once the moving party has satisfied this requirement, the nonmoving party has the burden of presenting facts that demonstrate a genuine issue of material fact for trial.  LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  All reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought.  Shafmaster v. United States, 707 F.3d. 130, 135 (1st Cir. 2013).

---

[1] In response to MMM's request for summary judgment, plaintiff conceded that dismissal of claims under Articles 1802 and 1803 of the Civil Code is appropriate (Docket No. 53 at pp. 22-23).

## II.     UNCONTESTED MATERIAL FACTS[2]

### A.  The Parties

MMM operates a health insurance plan designed for Medicare Advantage beneficiaries. See, Docket No. 43, "Defendant's Statement of Material Facts over which there are no Genuine Issues to be Tried" ("SUMF" at ¶ 1).  It is highly regulated by state and federal law. Id. ¶ 2.  On October 16, 2012, plaintiff signed an Independent Promoter Agreement with TEAMS LLC to offer services to MMM as an Independent Promoter. SUMF at ¶¶ 4-5.[3]  She so served until June 2013. SUMF at ¶ 6. As an Independent Promoter, she rendered services to MMM, including but not limited to, generate valid leads (a/k/a Scope of Appointments), through authorized marketing activities, following all CMS rules and MMM policies and procedures. SUMF at ¶ 7.[4]  In that capacity, she interacted on a daily basis with the Sales Supervisor of MMM's Sales Department, Roberto R. Rodríguez-Delgado who overlooked her work. SUMF at ¶ 9.[5]

Rodríguez-Delgado and Sales Manager Brenda Real approached plaintiff while she was an Independent Promoter and talked to her about applying with MMM for an employment position in sales. SUMF at ¶ 10.  So on June 20, 2013, plaintiff applied for the Outside Sales Representative ("OSR") position at MMM. SUMF at ¶ 12, was interviewed by Rodríguez-Delgado and Real, SUMF at ¶ 13; and four days later, was hired for the position of OSR of MMM's Sales Department

---

[2] Plaintiff admitted most of the facts (Docket No. 54, admitting statements 1-8; 10-17; 20-25; 27-66; 68-88; 91-104; 108; 114; 119; 124; 135; 138-140; 142-144; 150-163) and submitted her Statement of Additional Facts with 37 additional proposed statements (Docket No. 55).

[3] Plaintiff was born on February 22, 1967. SUMF at ¶ 3.

[4]  A Scope of Appointment, also referred to as "boleta" or "lead," is a form that authorizes an MMM representative to approach potential affiliates or beneficiaries prior to giving an orientation and close sales. SUMF at ¶ 8.

[5] Plaintiff's denial does not contest this fact. It only explained that Alberto Muñoz was her supervisor when she was an independent promoter and that Roberto Rodríguez became her supervisor when she became a sales rep (Docket No. 54 at ¶ 9.1).  But this clarification does not controvert SUMF at ¶ 9. In fact, the deposition excerpt cited in support of her denial does not even mention Rodríguez.

under Rodríguez-Delgado's supervision. SUMF at ¶¶ 14 and 16.  Rodríguez-Delgado was her only

direct supervisor. Id.  She was 46 years old at the time (id.); and held that position for 10 months.

SUMF at ¶ 15.[6]

As an Independent Promoter, plaintiff was not authorized to sell MMM (Medicare

Advantage) products, because Independent Promoters are not licensed. SUMF at ¶ 20.  Conversely,

to occupy the OSR position with MMM, plaintiff needed a license issued by the Puerto Rico

Insurance Commissioner to sell MMM's products. SUMF at ¶ 21.  Because she expressed that she

did not have the money to pay the fee to obtain the license, Rodríguez-Delgado helped her by

offering and lending the money that she needed for that purpose. SUMF at ¶¶ 22 and 23.

### B.  MMM's Policies and Agreements

Plaintiff reviewed and acknowledged receipt of (1) the Job Description for the OSR

position which included basic guidelines for meeting job requirements and responsibilities (SUMF

at ¶ 24); and (2) the "Sales Representative or Independent Producers Agreement Letter", which

was also discussed with her. SUMF at ¶ 28. Likewise, she (i) certified that she understood that any

coordinated marketing to be offered had to be done in accordance with all applicable laws, CMS

policies (including CMS marketing guidelines) and all Federal Health Care laws (SUMF at ¶ 29);

(ii)  understood and had knowledge that while working as an OSR for MMM she was prohibited

from performing *any* of the following: (a) engage in any discriminatory activity; (b) solicit door-

to-door for Medicare beneficiaries or through other unsolicited means of direct contact, including

calling a beneficiary without the beneficiary initiating the contact; (c) engage in any other

marketing activity prohibited by CMS in its marketing guidance (SUMF at ¶ 30); (iii) received

---

[6] That is, from June 24, 2013 until April 16, 2014. Id. As an Outside Sales Representative, plaintiff's base salary consisted of $30,000.00, a monthly car allowance of $675.00, and marginal benefits. SUMF at ¶ 17.

MMM policies, trainings, guidance and orientations regarding anti-discrimination policies and the policies, procedures and regulations that applied to the OSR position she occupied at MMM (SUMF at ¶ 31); (iv) was given, signed and acknowledged MMM's Employee Handbook (SUMF at ¶ 33);[7] and (v) reviewed and knew of MMM's Rules of Conduct (SUMF at ¶ 39). Plaintiff was already familiar with most of these duties, policies and procedures, and their rigorousness since, as an Independent Promoter, she had seen them first hand and received trainings and guidance regarding specific policies and regulations applicable to sales in her new job, such as CMS and MIPPA regulations. SUMF at ¶ 32.

In addition, MMM had written policies concerning progressive discipline, including, the Employee Counseling/Progressive Discipline Policy, which applied when an employee failed to meet MMM's or job expectations or violated MMM's policies and/or CMS provisions. SUMF at ¶ 40. To that end, the Policy provided that an employee could be subject to progressive discipline or may be immediately terminated depending on the nature of the incident. SUMF at ¶ 41.

## C. Plaintiff's Duties as OSR

Plaintiff's duties as an OSR included, but were not limited to: (1) complying with her primary job responsibility of conducting seminars and in-home sales presentations to eligible and potential Medicare beneficiaries to close sales, (2) provide information about MMM's products to interested persons for which a valid written authorization had been received by MMM, (3) comply with MMM's policies and procedures, as well as CMS rules and regulations; (4) create in-home

---

[7] MMM's Employee Handbook received included the institutional policies concerning diversity and equality, equal employment opportunity and prohibiting discrimination, harassment and retaliation due to protected categories including age; and provided employees with a complaint procedure to report any complaint including, but not limited to, if they felt they had been discriminated, harassed or retaliated against. A confidential phone line and web based system called "Ethics Point" existed so that employees could report any complaints or improper conduct or practices that were affecting the work environment. The Handbook included an Open Doors policy that allowed employees to bring any problems, disagreements, questions or recommendations through a chain of command starting with their supervisor, or, if that did not satisfy the employee or the situation involved the supervisor, to report it to a representative of the Human Resources Department or any management member. SUMF at ¶¶ 35-38.

reports, reports of leads results and reports of visits to providers (doctors); (5) submit these reports on a daily basis to the Sales Supervisor Rodríguez by 7:30 a.m.[8]; (6) visit once or twice per month the providers assigned to her to generate sales leads through referrals and to coordinate activities. SUMF at ¶¶ 25-27.

The OSRs met on a monthly basis with their supervisor to discuss their Primary Responsibilities Form ("Hoja de Responsabilidades Primarias"), which described MMM's expectations and the monthly results or progress of OSR's as to their duties. SUMF at ¶ 46. Among the matters that were discussed in these HRP forms were objectives such as: monthly sales quota vs. sales closed; monthly presentations quota vs. presentations given; reports submitted late; monthly quota of visits to providers vs. results/total of visits made to providers. SUMF at ¶ 47.

**D. Plaintiff's Performance**.

**1. Probatory Period Evaluation**

On September 23, 2013, Rodríguez-Delgado evaluated plaintiff through a probationary period evaluation, which she received and signed. SUMF at ¶ 43. The evaluation stated that plaintiff presented doubts regarding MIPPA regulations and that her sales reports contained many errors. Nevertheless, she was given the opportunity to hold a regular employee position as an OSR. SUMF ¶ 44.

---

[8] The parties strongly disagree as to the 7:30 a.m. requirement. While referring to her job description (Docket No. 54, Exh. 6), plaintiff contends that the reports were due at 7:45 a.m. and not at 7:30 a.m. MMM, in turn, avers that the practice was to submit daily reports by 7:30 a.m. to the Sales Supervisor, as plaintiff herself admitted during her deposition. Moreover, at least seven out of ten times, it was brought to plaintiff's attention that she had failed to submit the reports by 7:45 a.m. as well (Docket No. 62-15).

### 2. Plaintiff's HRPs Evaluations

In plaintiff's HRP corresponding to her August 2013 performance, Rodríguez-Delgado brought to her attention that she complied with 4 out of 9 performance indicators. SUMF ¶ 48.[9] In the HRP corresponding to September 2013 performance, she complied with 3 out of 9 performance indicators. SUMF ¶ 49.[10] In the HRP corresponding to October 2013, she complied with 3 out of 9 performance indicators. SUMF ¶ 53.[11] In the HRP corresponding to November 2013, she complied with 6 out of 10 performance indicators. SUMF ¶ 54.[12] In the HRP corresponding to December 2013, she complied with 5 out of 10 performance indicators. SUMF ¶ 55.[13] In the HRP corresponding to January 2014, she complied with 5 out of 10 performance indicators.                                                                SUMF

---

[9] In particular, she did not meet expectations as to the following indicators: daily arrival at the office duly coordinated; presentations performed; monthly visits to providers; percentage of send backs; percentage of cancellations.

[10] In particular, she did not meet expectations as to the following indicators: daily arrival at the office duly coordinated; percentage of conversion of presentations to sales (closing rate); percentage of the total of eligible "boletas" presented (also known as "Scope of Appointment" or "Confirmation of Sales Appointment Form"); monthly visits to providers; percentage of send backs; percentage of cancellations.

[11] In particular, she did not meet expectations as to the following indicators in addition to the percentage of sales vs. quotas: daily arrival at the office duly coordinated; presentations performed; percentage of conversion of presentations to sales (closing rate); percentage of the total of eligible "boletas" or "scope of appointment" presented; rapid disenrollment rate; monthly visits to providers. Additionally, it is uncontested that in October plaintiff only reached 22 gross sales instead of 40, which was the required monthly sales quota for the month. SUMF at ¶ 52. On November 7, 2013, she received and discussed with Supervisor Rodríguez a "Record of Conversation" because of this. At that time, Rodríguez counseled plaintiff of MMM's expectations and that she was required to consistently meet the monthly sales quota. Additionally, he warned her that if her performance did not improve she could be subject to disciplinary measures including a written warning, a final warning or termination of employment. SUMF at ¶ 51.

[12] She did not meet expectations as to the following indicators: daily arrival at the office duly coordinated; percentage of the total of eligible "boletas" or "scope of appointments" presented; monthly visits to providers; percentage of send backs.

[13] She did not meet expectations as to the following indicators: daily arrival at the office duly coordinated; percentage of conversion of presentations into sales (closing rate); percentage of rapid disenrollment rate; monthly visits to providers; percentage of cancellations.

¶ 56.[14] In the HRP corresponding to February 2014, she complied with 3 out of 10 performance indicators. SUMF ¶ 57.[15]

### 3. Additional performance issues.

On multiple occasions between December 2013 and February 2014, Rodríguez-Delgado asked and reminded plaintiff of her duty to timely submit her required sales reports (also known as "In Home Reports") and to provide the planned routes. SUMF ¶ 58.  Because she failed to submit these reports in a timely manner during December, January and February, on February 21, 2014, plaintiff received and discussed a Record of Disciplinary Action from Rodríguez-Delgado for this violation. SUMF ¶ 59.  She was further warned that her actions were affecting the daily process of the Sales Department, generation of reports, quality calls, and audits, among others. SUMF ¶ 60.  She was informed that if she incurred in a similar practice or violated any CMS regulation or company policies and procedures, MMM would be forced to take more severe disciplinary measures resulting in the conclusion of her employment. SUMF ¶ 61.  Plaintiff did not write any comments or objections in the space provided by the document for the employee to do so.  SUMF ¶ 62.

On March 5, 2014, Rodríguez-Delgado warned plaintiff that she did not meet her adjusted monthly sales quota of 18 sales and only made three sales, which she admitted (SUMF ¶¶ 63, 64), informing her that it was the second time within six months she had failed to meet monthly sales requirements, as back in November 2013 the same issue was brought to her attention.  SUMF

---

[14] She did not meet expectations as to the following indicators: daily arrival at the office duly coordinated; presentations performed; monthly visits to providers; percentage of send backs; percentage of cancellations.

[15] She did not meet expectations as to the following indicators: percentage of sales vs. quota; daily arrival at the office duly coordinated; presentations performed; percentage of conversion of presentations into sales (closing rate); percentage of the total of eligible "boletas" or "scope of appointments" presented; monthly visits to providers; percentage of cancellations.

¶ 65.  She was informed that if she did not improve her performance and was not consistent in meeting the monthly sales quota, MMM would have to take more severe actions, including issuing a Final Warnings and/or ending her employment. SUMF ¶ 66.

Plaintiff failed to meet the monthly sales quota in October 2013 and February 2014, and was placed on an Action Plan to help her with her productivity and sales.  SUMF ¶ 69. The plan was set to expire on March 31, 2014.  Plaintiff admitted that she was not the only subject receiving the same type of written warning as it was given to all other sales representatives who failed to meet the monthly sales quota; that in every sales representatives' records there were warnings like hers; and that other coworkers were terminated for failure to meet sales quotas. SUMF ¶ 67.[16]

On March 17, 2014, Rodríguez-Delgado met with plaintiff (SUMF ¶ 73); informing her that she was not complying with the plan objectives, and that failure to comply with the objectives in the Action Plan would result in other disciplinary measures, including termination of employment.  SUMF ¶ 75.  Plaintiff received, signed and agreed to the Action Plan Follow-Up. SUMF ¶ 76.  On April 2, 2014, Rodríguez-Delgado met with plaintiff to discuss the Action Plan Closing Memo.  SUMF ¶ 77. The Memo, which plaintiff signed and agreed to, reiterated her lack of compliance with the objectives. SUMF ¶¶ 79, 82.

The next day, Rodríguez-Delgado and plaintiff discussed the "Final Written Warning" for her continuing failure to meet the monthly sales quota for three months. SUMF ¶ 83. This final

---

[16] Plaintiff denied this fact by claiming that the cited deposition does not support the proposed fact.  But plaintiff is wrong as the portions of plaintiff's deposition cited in support of this statement support the proposed fact. See, Exhibit 6, Plaintiff's Second Deposition, at p. 187, ll. 5-16, 21-25; p. 188, ll. 1-14; p. 190, ll. 2-11.

Carmen Rodríguez-Cardi v. MMM Holdings, Inc.
Civil No. 14-1854 (PAD)
Opinion and Order
Page 10

warning included a "Final Action Plan," aimed at helping her one last time with her productivity and sales. SUMF ¶ 85.  Plaintiff signed and agreed to the Final Action Plan. SUMF ¶ 88. [17]

### 4.  The Marketing Misrepresentation Incident.[18]

Pursuant to MMM's Scope of Appointment policy MKT-0047, an OSR must have an acceptable form of authorization (i.e. Scope of Appointment) issued by the Medicare beneficiary or legal representative prior to a sales presentation appointment, for it is strictly prohibited that any OSR and/or marketing personnel engage in unsolicited contact with potential enrollees. SUMF ¶ 94.  A violation can result in employment termination. SUMF ¶ 95.

Consistent with this obligation, a beneficiary cannot be approached or contacted via face-to-face or outbound call without his/her initial written consent. SUMF ¶ 96.  In addition, Sales Investigation Process Policy CMP-0046, provides for the development of recommendations that can result from the compliance investigation process, stating that if the violation involves door-to-door solicitation the corresponding recommendation is immediate suspension or termination. SUMF ¶ 97. Moreover, MMM's Standards of Conduct for Sales and Marketing Activities provide guidance of the disciplinary measure to be applied when specific sales and marketing violations have been incurred by an MMM employee, SUMF ¶ 98, indicating that if an employee calls or

---

[17] Plaintiff admitted that Rodríguez-Delgado assigned all sales representatives who were not meeting the monthly sales quotas to action plans similar to the one to which Plaintiff was assigned on April 2014, regardless of who the sales representative was. SUMF at ¶ 90.  In plaintiff's own words:

> Q:      That is, that, if a salesperson is not reaching these sales, they are given the same plan like this one?
> A:      Yes.
> Q:      No matter who it is?
> A:      Yes.

See, Docket No. 62-4 at p. 206.

[18] In her PASF plaintiff mainly questions the events surrounding the unsolicited contact and alleges that the incident did not happen. But see discussion at p. 18.

visits a beneficiary who was referred by a friend, provider, provider's secretary, any other third party without obtaining a scope of appointment prior to contact and member attestation form (testimonial), the corresponding disciplinary measure would be employment termination. SUMF ¶ 99.[19]

On March 14, 2014, MMM received a referral from CMS Caseworker E. Dumas of an MMM beneficiary's complaint reported through 1-800-MEDICARE alleging marketing misrepresentation. SUMF ¶ 91. On March 30, 2014, Compliance Auditor Specialist Frances Benítez commenced a compliance investigation regarding the complaint. SUMF ¶ 92. According to the information obtained during the course of the investigation, plaintiff was the sales agent involved, and had interacted with the complaining beneficiary Ms. Doe.[20]  SUMF ¶ 93.

On April 11, 2014, Benitez completed the investigation. SUMF ¶ 114, concluding, among other things, that plaintiff incurred in door-to-door solicitation, when visiting Ms. Doe, showing up at Ms. Doe's house without prior and valid authorization. SUMF ¶ 115. Further, she found that the Scope of Appointment and the Attestation were not properly obtained because plaintiff obtained them by showing-up at Ms. Doe's residence without a proper prior contact (id.), and recommended that plaintiff employment be terminated. SUMF at ¶ 122.[21]

---

[19] It is uncontested that plaintiff (i) received training of MMM's Scope of Appointment Policy, Sales Investigation Process Policy and Standards of Conduct,  sales and marketing policies; (ii) was trained on MIPPA regulations (which covered guidance and examples of actions and/or conducts that were prohibited and allowed, discussion of what an unsolicited contact or door-to-door solicitation entailed, valid authorization forms and/or methods, use of the attestation form (testimonial), among other things); and (iii) completed MMM's required tests and quizzes regarding CMS regulations, MIPPA regulations and Compliance trainings. SUMF at ¶¶ 100-102.

[20] Due to confidential nature of the information, the court will not disclose the name of the beneficiary.

[21] In response to SUMF ¶ 122, plaintiff admits that termination was recommended. In addition, but without any record citation or support, she denies the basis for the termination.

Benitez' recommendation was upheld by MMM's Human Resources Director, Gloribel Rivera-Cabrera, SUMF at ¶ 123, who agreed with the proposed course of action after evaluating the Compliance Investigation Report, plaintiff's record, her training, applicable polices, regulations, prior disciplinary actions and plaintiff's history of performance and productivity problems. Id.[22] Accordingly, on April 16, 2014, plaintiff's employment terminated.  SUMF at ¶ 124.  On June 2014 and October 2015, MMM terminated two OSRs who, like plaintiff, incurred in a violation of unsolicited contact. These two OSRs were ages 34 and 29 at the time of their termination, respectively. SUMF at ¶ 125.[23]

After plaintiff's termination, doctors assigned to her to generate leads were distributed among eight of her former co-workers in Outside Sales Representative positions in MMM's Sales Department. Their ages ranged from 27 to 40. SUMF at ¶ 126.[24]  The Independent Promoter

---

[22] Plaintiff admitted in part and denied in part this statement while referring to a portion of Rivera's deposition testimony and claiming that MMM "is changing position in this case" (Docket No. 54 at p. 21).  But the record citation does not support plaintiff's denial. And, as the court will discuss in detail below, plaintiff's allegation that MMM is giving different explanation of her termination finds no support in the record. During her deposition, HR Director Rivera testified that she coincided with the recommendation given by Benitez in the "Compliance Investigation Report," but that in addition to the report …

> A:      I revised the employee case file. I revised the training history to know if the employee had been trained in these policies.
> Q:      Okay.
> A:      The policies that, the policy, the regulation reference in the report, the previous discipline the employee had and her previous performance.
> Q:      That is what is normally done in these cases?
> A:      That is what is normally done in these cases, all the criterias are evaluated. All these criterias are taken into consideration for any termination, even when the breach, for example, in this case, even when the breach was a recommendation of termination, even so we take into account all of the criteria, all the other criteria that I have mentioned.

See, Docket No. 62-31, Certified translation of MMM's Exh. 42 at pp. 10-11. See also, Docket No. 43-1, MMM's Exh. 1 and its answer to Question No. 15.  Therefore, plaintiff's contention that HR Director Rivera testified that her termination was due to a violation of CMS Policy and had nothing to do with her performance is simply incorrect.

[23] Nothing in plaintiff's explanation while denying this statement serves to contest the fact that in June of 2014 and October 2015, MMM terminated two OSRs who incurred in violation of unsolicited contact. That plaintiff disagrees on the legal effect of those decisions do not serve to contest this statement.

[24] Plaintiff denies this statement while referring the court's attention to one page of her deposition. But nothing in said testimony serves to contradict this statement. Therefore, it is uncontested.

assigned to plaintiff to perform her Outside Sales Representative duties was reassigned to OSR

with employee number 3745, who was age 40 at the time of plaintiff's termination.  SUMF at ¶

127.[25]

## E.  Alleged Age-Related Remarks[26]

According to plaintiff, some of her co-workers referred to her as "la mayor del grupo" (the

oldest in the group), SUMF at ¶ 129, while two of her OSR co-workers, referred to her as "la

vieja," SUMF at ¶ 130, stated that her hairstyle was "antiguo" (old-fashioned) and "te peinas como

una vieja" (that she combed her hair like an old woman), SUMF at ¶ 131,[27] commented that she

used an old woman's coat (SUMF at ¶ 134), which she described as a hand-knitted sweater she

had it in various colors (SUMF at ¶ 135), mentioned that she "stayed behind" because her phone

did not have an internet feature and that she should throw away her phone because it was old.

SUMF at ¶ 138,[28] made comments and jokes regarding her car, SUMF at ¶ 142, an S.U.V. model

---

[25] Moreover, although plaintiff alleges Gretchen Escalona substituted her, she admits that she was not at MMM to witness what was assigned to Escalona. Instead, she agrees that her allegation is based on what others told her. SUMF at ¶ 128.

[26] In her complaint, plaintiff claims she was subject to "jokes related to her age," including jokes about her fashion, hairstyle, clothing, old cellphone and car (Docket No. 13 at ¶ 10). See also, Docket No. 55, "Plaintiff's Statement of Additional Fact" ("PSAF") at ¶¶ 28-29.

[27] When asked about her reaction to those comments, plaintiff stated that she did nothing. SUMF at ¶ 132.  During her deposition, plaintiff explained that she complained to her supervisor when she got tired of those comments.  In addition, she testified that she only told Rodríguez that she was feeling bad because "they" – without stating who "they" were – were making "comentarios fuera de lugar, y molestando" (making out of place comments and bothering her). See, Docket No. 54 at ¶ 132. Plaintiff supported her contention by referring to page 172 of Exh 3 (which includes one part of her deposition testimony). But only the Spanish version of that page was submitted by plaintiff.  And the court notes that plaintiff submitted the certified translations of her deposition at Docket No. 81-1. However, a certified translation of page 172 of Exh. 3 was not included. Pursuant to 48 U.S.C. § 864, "[a]ll pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language."  Similarly, Local Rule 5(g) requires, that "[a]ll documents not in the English language which are presented or filed, whether as evidence or otherwise, must be accompanied by a certified translation into English prepared by an interpreter certified by the Administrative Office of the United States Courts.  The court cannot consider documents that do not comply with this requirement. See, Puerto Ricans for Puerto Rico Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008)(so explaining). González-De-Blasini v. Family Department, 377 F.3d 81, 89 (1st Cir. 2004)(applying rule). And the court has no independent duty to search for the certified translation of said page in the entire record.  See, Local Civ. Rule 56.  In any event, the Spanish version of her deposition does not support her contention either. For these reasons, her PSAF at ¶¶ 28-30 finds no support in the record.

[28] Plaintiff explained she had the phone for over 12 years. SUMF at ¶ 139.  When asked about her reaction to these comments, plaintiff stated that she ignored them because they were immature and she was not going to fight because of that. SUMF at ¶ 140. Plaintiff could not provide specific dates when the comments regarding her phone were made to her.  SUMF at ¶ 141.

Safari and of year 1987, which she used to travel to work, SUMF at ¶ 143, which she considered old. SUMF at ¶ 144.[29]

## III.   DISCUSSION

With this factual background, plaintiff alleges to have been discriminated against because of her age in violation of the ADEA and Law 100, to have been subjected to a hostile work environment because of her age, and to have been unjustly discharged under Law 80.

### A.  ADEA

Under the ADEA, an employer may "not discharge ... or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] age." 29 U.S.C. § 623(a)(1). A plaintiff asserting a claim under the ADEA has the burden of establishing "that age was the 'but-for' cause of the employer's adverse action." See, Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 138 (1st Cir.2012)(quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009)).  Differently stated, the plaintiff's age must have been the determinative factor as opposed to merely a motivating factor in the employer's decision. Gross, 557 U.S. at 168.

Where, as here, plaintiff does not have direct evidence of discrimination, courts evaluate this claim under the burden-shifting framework drawn from McDonnell Douglas v. Green, 411 U.S. 792 (1973).  Consistent with this framework, plaintiff must establish that she (1) was at least 40 years old at the time of the adverse action; (2) met the employer's legitimate expectations; (3)

---

[29] She testified that she never reacted to any of those comments. SUMF at ¶ 145.  Plaintiff denies this statement for the same reason discussed at footnote 26. During her deposition, plaintiff testified as follows:

> Q:        . . . Did you react in any particular manner with regard to the comments about your S.U.V.?
> A:        No, never. To any comment, never.

See, Docket No. 62-1 at p. 169, ll. 2-5.

suffered an adverse employment action; and (4) the employer filed the position, thereby showing a continuing need for the services that she had been rendering.  Adamson v. Walgreens Co., 750 F.3d 73, 78 (1st Cir. 2014).

If the plaintiff succeeds in establishing a *prima facie* case, the presumption arises that the employer unlawfully discriminated against plaintiff, shifting to the employer the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action.  Benoit v. Technical Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003); Champagne v. Servistar Corp., 138 F.3d 7, 12 (1st Cir. 1998).  If the defendant is successful in satisfying its burden, plaintiff no longer can rest on the initial inference of discrimination.  Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007).  The inference raised by the *prima facie* case dissolves, and the last transfer of burdens occurs.  Mesnick v. General Electric, 950 F.2d 816, 823 (1st Cir. 1991), cert. denied 504 U.S. 985 (1992).

In that case, the burden shifts back to the plaintiff to show that the reason proffered was a pretext concealing unlawful discrimination of the type alleged.  Rodríguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999).  By extension, plaintiff's burden of producing evidence to rebut the employer's stated reason for its employment action thus merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 6 (1st Cir. 2000); Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 (1st Cir. 2009).

The court assumes that plaintiff established a *prima facie* case of discrimination, which MMM rebutted, articulating and producing a evidence on the reason for its decision, plaintiff's performance problems involving, inter alia, failure to meet sales quota, latenesses, untimely reports, violation of company policy, all of which are recognized as legitimate, nondiscriminatory

reasons for the employer's action. <u>See</u>, <u>Meléndez</u> v. <u>Autogermana</u>, 622 F. 3d 46, 51-52 (failure to meet sales quota); <u>Menzel</u> v. <u>Western Auto Supply Co.</u>, 848 F.2d 327, 331 (1st Cir. 1988)(violation of company policy); <u>Bennet</u> v. <u>Watson & Wyatt & Co</u>, 136 F. Supp. 2d 236, 246 (S.D. N.Y. 2001)(lateness). And thus, the inquiry moves to the next phase, placing upon plaintiff the burden of showing that the employer's given reason was pretextual and that the record would permit a reasonable jury to infer that the real reason was discriminatory animus based on her age. <u>See</u>, <u>Meléndez</u>, 622 F.3d at 50)(applying test).

Pretext "means something worse than a business error." <u>Ronda-Pérez</u> v. <u>Banco Bilbao Argentaria-Puerto Rico</u>, 404 F.3d 42, 45 (1st Cir. 2005). It means deceit – a lie – a made-up story to cover one's tracks. <u>See</u>, <u>Collazo-Rosado</u> v. <u>University of Puerto Rico</u>, 765 F.3d 86, 92 (1st Cir. 2014)(so observing). To that end, pretext analysis is more demanding than the assessment of whether a <i>prima facie</i> case has been established, <u>Mariani-Colón</u> v. <u>Department of Homeland Sec. ex. rel. Chertoff</u>, 511 F.3d 216, 222 (1st Cir. 2007) (so noting), moving the inquiry to a new level of specificity. <u>Kosereis</u> v. <u>Rhode Island</u>, 331 F.3d 207, 213 (1st Cir. 2003)(applying formulation). It directs the court's focus to the perception of the employer, to determine whether the decisionmaker believed the stated reason is real. <u>See</u>, <u>Ronda-Pérez</u>, 404 F.3d at 45 (discussing topic). This can be demonstrated in a variety of ways, such as showing that the employer proffered different and arguably inconsistent explanations for its decision, unless the record reveals that the real motive was an unstated nondiscriminatory reason, <u>Collazo-Rosado</u>, 765 F.3d at 93; comparative evidence that plaintiff was treated less favorably than similarly situated employees; <u>Kosereis</u>, 331 F.3d at 213; and sufficiently probative discriminatory comments, <u>González</u>, 304 F.3d at 69-72.

From this perspective, the record is devoid of any evidence demonstrating that MMM's articulated reason for its decision to terminate plaintiff is pretextual, much less a pretext to discriminate against plaintiff because of her age.  For the most part, plaintiff does not context the performance problems, of which she was aware.  See, La Montagne v. American Convenience Products, Inc., 750 F.2d 1405, 1414-1415 (7th Cir. 1984)(dismissing age discrimination claim in part because plaintiff failed to show that defendant's reasons for termination lacked a basis in fact); Kerns v. Capita Graphics, Inc., 178 F.3d at 1018 (plaintiff did not dispute that she made errors at various points or that her actions produced undesirable consequences for the company).  Nor is there evidence that other, similarly situated employees were treated more favorably than plaintiff was.  See, García-García, 878 F.3d at 424-425 (dismissing discrimination claim in part because plaintiff failed to show that other similarly situated employees were treated differently); Benoit, 331 F.3d at 174 (rejecting discrimination claims of plaintiff unable to show that other similarly situated employees outside of the protected group were treated differently); Zapata-Matos v. Reckitt & Colman, 277 F.3d at 40, 47-48 (1st Cir. 2002)(summary judgment dismissing discrimination claim of plaintiff whose employment terminated but could not show that employer treated him differently than it treated other employees).  Compare with Acevedo-Parrilla, 696 F.3d at 144-145 (pretextual nature of proffered explanation found where similarly situated younger employee was not reprimanded or disciplined for incidents similar to the problems that led to plaintiff's termination).[30]

---

[30] Plaintiff complains about the assignment of "hot visits." These visits are referrals generated by the MMM's Telemarketing Department when an individual interested in MMM's products contacts MMM to receive orientation. Once the Telemarketing Department takes the general information from the interested individual, it sends via e-mail a Scope of Appointment to a Sales Supervisor. Then the Sales Supervisor would forward via e-mail the Scope of Appointment to one of his/her OSRs. SUMF at ¶ 160.  In plaintiff's view, Rodríguez-Delgado assigned her the worst and very few "Hot Visits." SUMF at ¶ 160.  However, (i) she could not provide a date in which she allegedly complained to Rodríguez-Delgado that he had "preference" with three or four out of ten of her co-workers regarding the assignment of the "Hot Visits" (SUMF at ¶ 161) and (ii) this "preference" concern was shared by all other OSRs (SUMF at ¶ 162).  Therefore, it is hard to conclude that as the "oldest in the group" she was the target of

Plaintiff does not even suggest that Benitez or Rivera were motivated by any illegal or inappropriate animus when conducting the investigation, when evaluating the findings of the investigation, and does not contest her prior disciplinary actions and history of performance productivity problems.  She mainly questions the events surrounding the unsolicited contact, alleging that the incident did not happen. But what she is doing is begging the court to replace MMM's judgment with its own by asking whether MMM's interpretation of Policy and Procedure MKT0047 and her noncompliance with the policy, and the court may not supplant MMM's decision with its own as long as it is satisfied that MMM had a nondiscriminatory rationale for its decision. See, Fennell v. First Step Designs, Ltd., 83 F.3d 526, 537 (1st Cir.1996) ("[c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality of employers' nondiscriminatory business decisions.").  At the end of the day, the issue is not whether the employer's reasons to fire plaintiff were real, instead of merely whether the decisionmakers believed them to be real.  See, Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir. 1996). And there is no ground to conclude otherwise here.

Plaintiff claims MMM is "changing positions in this case" as to the reasons for her termination (Docket No. 53).   The record, however, shows that MMM coincided with the recommendation given by Benitez in the "Compliance Investigation Report," and that *in addition to the report*, the decision was made after reviewing plaintiff's training history to know if the employee had been trained in the applicable policies as well as her previous discipline and performance record. See, Docket No. 62-31, Certified translation of MMM's Exh. 42 at pp. 10-11.

---

Rodríguez-Delgado's alleged selective assignment of cases.  See Colón v. Medtronic, Inc., 2015 WL 5089494, *19 (D.P.R. August 27, 2015)(no altered work conditions based solely on work assignments plaintiff subjectively perceived as discriminatory).  Plaintiff admitted that during her employment with MMM her base salary and car allowance remained the same and were not reduced (SUMF at ¶ 18) and that nobody's salaries including hers were increased. SUMF at ¶ 19.

Carmen Rodríguez-Cardi v. MMM Holdings, Inc.
Civil No. 14-1854 (PAD)
Opinion and Order
Page 19

See also, Docket No. 43-1, MMM's Exh. 1 and its answer to Question No. 15.  In this way,

plaintiff's age discrimination claim under ADEA fails as a matter of law.[31] The same conclusion

follows with respect to Law 100.

## B.  Law 100

Like the ADEA, Law 100 provides a cause of action in favor of persons who suffer

discrimination in their employment because of their age.  See, P.R. Laws Ann. tit. 29 § 146

(prohibiting discrimination in protected categories including age, and laying out remedies for

violation).  In the absence of direct evidence of discrimination, a plaintiff may rely on

circumstantial evidence through the "just cause" framework set in Article 3 of the statute.[32]  At its

core, the framework consists of three stages: (1) a *prima facie* case; (2) burden shifting; and (3)

ultimate demonstration of discrimination.  See, Caraballo-Cecilio v. Marina PDR Tallyman LLC,

2016 WL 6068117, *2 (D.P.R. Oct. 13, 2016)(describing framework).

---

[31] An additional ground in support of this conclusion exists. That is, the applicability of the "same actor inference," triggered by the fact that the hirer is the same person or the same "actor" that terminates the employee, in this case, Rodríguez-Delgado.  There are strong and weak versions of the inference.  See, Ortiz-Rivera v. Astra Zeneca, 596 F. Supp. 2d 231, 241 (D.P.R. 2009), *aff'd* 363 Fed. Appx. 45 (1st Cir. 2010)(so explaining).  This doctrine presupposes that "[i]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 847 (1st Cir.1993) (quoting Proud v. Stone, 945 F.2d 796 (4th Cir.1991)); see also, Anderson v. Hertz Corp., 507 F.Supp.2d 320, 330 (S.D.N.Y. 2007)(stating that the same actor inference "clearly applies" to further cast doubt on any potential inference of invidious discrimination in plaintiff's termination, where the manager hired plaintiff in March 2002 and fired him just over ten months later).  It is encompassed in the Fourth Circuit's observation that "claims that employer animus exists in termination but not in hiring seem irrational," Proud v. Stone, 945 F. 2d 796, 797 (4th Cir. 1991), and for the same reason, that "[i]t hardly makes sense [for a putative discriminator] to hire workers from a group that he dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." Id.  Plaintiff does not contest that Rodríguez-Delgado is the "same actor" for purposes of this analysis.  To the contrary, she refers the court's attention to case law in the Sixth, Seventh, Eight and Eleventh Circuit for the proposition that courts have limited the application of this doctrine without discussing why the court should adopt those views.  It is not enough "merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  See, United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  Regardless of which version is applied, no evidence has been submitted to undercut the same actor circumstance, an important factor confirming the absence of discriminatory animus.

[32] Article 3 provides that the acts mentioned in Articles 1 and 2 (*i.e.* discharge, layoff, and failure to hire), shall be presumed to have been committed in violation of Law No. 100 "whenever the same shall have been performed without just cause."  P.R. Laws Ann. tit. 29 §§ 146, 148.  The presumption is of a "controvertible character."  Id. at Section 148.

A plaintiff establishes a *prima facie* case by demonstrating that: (1) she suffered an adverse employment action; (2) the adverse action lacked just cause; and (3) there exists some basic fact substantiating the type of discrimination alleged. See, Rodríguez v. Executive Airlines, Inc., 180 F.Supp.3d 129, 132-133 (D.P.R. 2016)(setting forth elements of *prima facie* case under Law 100); Varela Teron v. Banco Santander de Puerto Rico, 257 F.Supp.2d 454, 466 (D.P.R.2003)(same).[33] A *prima facie* showing activates that the plaintiff has been the victim of discrimination. See, García-García v. Costco Wholesale, 878 F.3d 411, 423 (1st Cir. 2017)(pointing out effect of presumption); Ramos v. Davis & Geck, Inc., 167 F.3d 727 (1st Cir. 1999)(same). The term "just cause" is construed by reference to Law 80. See, Rodríguez, 180 F.Supp.3d at 133 (so recognizing).

The employer may rebut the presumption proving legitimate, non-discriminatory grounds for the challenged action. See, De Arteaga v. Pall Ultrafine Filtration Corp., 862 F.2d 940, 941 (1st Cir. 1988)(once activated, the presumption requires employer to prove that the action in question was not discriminatory); Ramos-Santiago v. WHM Carib, LLC, 2017 WL 1025784, *6 (D.P.R. March 14, 2017)(citing López Fantauzzi v. 100% Natural, 181 D.P.R. 92, 123 (2011)(explaining, among other things, how employer may rebut the presumption). The burden is one of production and persuasion. See, García-García, 878 F.3d at 423 (so noting). Should the employer carry this burden, the presumption of discrimination disappears, shifting the burden of persuasion back to the employee to show, without the benefit of the presumption, that the action

---

[33] See also, Rodríguez-Torres v. Caribbean Forms Manufacturer, Inc., 399 F.3d 52, 62 (1st Cir. 2005)(validating jury instruction to the effect that, for burden of proof in a Law No. 100 claim to shift to employer, plaintiff must prove that: she was in a protected class, was fired, and the termination was unjustified); Menzel v. Western Auto Supply Co., 848 F.2d 327, 331 (1st Cir. 1988)(pointing out that "[i]f plaintiff fails to show that there was no just cause, the presumption of discrimination is not activated").

was motivated by prohibited discrimination (in other words, that the reasons proffered were pretextual). The plaintiff bears the same burden if the presumption is not triggered. Id. & n. 22.

As discussed below in connection with Law 80, MMM has shown that it had just cause to dismiss plaintiff, from which it follows that plaintiff did not activate the presumption. But in accordance with García-García, the case moves one step further, for plaintiff to demonstrate that the reasons proffered for termination are a pretext to cover age animus. Since the Law 100 plaintiff is in the same situation as an ADEA plaintiff after the defendant has articulated a legitimate, nondiscriminatory reason for its actions," Álvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998), and plaintiff failed to show a genuine issue of material fact exists as to pretext under the ADEA, she cannot prove it as to Law 100 either. The absence of actionable pretext results in dismissal as a matter of law of both the ADEA and Law 100 claims. See, Velázquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007)(summary judgment dismissing ADEA and Law No. 100 claims for lack of evidence to infer that employer's justification was a pretext for impermissible age discrimination); Morales-Guadalupe v. Oriental Bank and Trust, 2018 WL 1116544, *8 (D.P.R. February 26, 2018)(same).

### C. Hostile Work Environment

Plaintiff claims she was subject to a hostile work environment because of her age. Under ADEA, harassment is actionable if it causes the plaintiff to subjectively perceive the work environment to be hostile or abusive, that environment is, on an objective basis, sufficiently severe or pervasive to alter the conditions of plaintiff's employment, and is inflicted because of the plaintiff's status as a member of a protected class. See Gutierrez-Lines v. P.R. Elec. & Power Auth., 751 F.Supp.2d 327, 341-342 (D.P.R. 2010)(citing O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir.2001)). To properly assess the claim, courts look at the totality of circumstances,

including the severity and frequency of the conduct; whether it was physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance.  See, Thompson, 522 F.3d at 180 (discussing elements of claim). None of these factors is individually determinative of the inquiry.  See, Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 31 (1st Cir. 2012)(so holding).  Teasing and isolated comments do not, however, create a hostile work environment.  See, Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)(discussing formulation).

Plaintiff alleges that she suffered from a hostile work environment due to her age because two of her co-workers made comments pertaining to her age, hairstyle, coat, phone and car, and that she was not invited to activities with younger co-workers.  The contention regarding the activities where younger co-workers participated but she was not invited is, by her own admissions, meritless.  In particular, plaintiff admitted that (i) she was not bothered that she was excluded from those activities (SUMF at ¶ 153); (ii) there were private social activities held after working hours, not MMM activities (SUMF at ¶ 154); (iii) could not recall any specific example of an activity to which she was not invited (SUMF at ¶ 155) or examples of dates or name of people that excluded her (SUMF at ¶ 156).  She never reported or complained about this matter and that was invited and participated in *all* activities organized by MMM for its employees. SUMF at ¶¶ 157-158.

The alleged ageist remarks involving her hair, coat, age, car, and phone do not suggest that plaintiff suffered any type of unwelcome harassment or any age-based animus towards her.  See Franco v. GlaxoSmithKline, 2009 WL 702221, *27 (D.P.R. Mar. 11, 2009)(no discriminatory animus when defendant called plaintiff "old man" numerous times per day);  Villegas-Reyes v.

Universidad Interamericana de P.R., 476 F.Supp.2d 84, 92 (D.P.R. 2007) (no hostile environment based on name-calling).

As previously explained, it remains uncontested that when asked if she reported the comments to anybody, plaintiff declared that on one occasion she informed Rodríguez-Delgado that she was feeling bad because they were making inappropriate comments and bothering her. Plaintiff admitted that was all she told him and nothing else. SUMF at ¶ 147.[34]   Rodríguez-Delgado, however, declared that he never heard comments related to plaintiff's age. SUMF at ¶ 149.  And it remains uncontested that plaintiff (i) did not report to Sales Manager Brenda Real the comments her co-workers were making to her (SUMF at ¶ 150); (ii) did not report to the Human Resource Department the comments co-workers were making to her (SUMF at ¶ 151); and (iii) did not complain in writing about these comments (SUMF at ¶ 152). The lack of specificity over when the comments may have been made and under what circumstances make them too vague to show the existence of an abusive work environment. See e.g., Menéndez v. Scotiabank, 134 Fed.Appx. 454, 456 (1st Cir. 2005) (dismissing age discrimination claim in part because plaintiff did not submit any evidence as to when the allegedly ageist statements were made or in what context); González, 304 F.3d at 69-70 (1st Cir. 2002)(rejecting allegedly ageist remarks in absence of evidence regarding context in which they were made; it was far from clear the remarks bespoke any age-based animus); Montes-Rosario v. GAP, Inc., 2016 WL 6945148, *4 (D.P.R. September 30, 2016)(same while considering inappropriate comments towards plaintiff – referring to her as "la vieja" since "forever" – in absence of evidence regarding context or specificity as to those comments).  Considering the record as a whole in plaintiff's favor, the claim fails.

---

[34] For this reason, PSAF at ¶¶ 30-31 are unsupported.

### D.  Law 80

MMM moved for summary judgment as to Law 80, and plaintiff did not respond.  Law No. 80 makes certain employers liable for payment of an indemnity to employees hired for undefined term who are dismissed without just cause.  See, Article 1 of Law 80, P.R. Laws Ann. tit. 29 § 185a.  It contains a general definition of just cause, and provides guidance on the application of this concept to various scenarios related to employee misconduct and performance; reductions-in-force and shutdowns; and employee expressions in administrative, judicial or legislative forums.  See, Article 2 of Law 80, P.R. Laws Ann. tit. 29 § 185b.  To that end, the term "just cause" includes: (i) grounds not motivated by a legally prohibited reason when the discharge does not result from the mere whim of the employer; and (ii) reasons linked to the proper and normal operation of the establishment.  Id. at § 185b.  The concept is dynamic, and its application contextual.[35]

In this case, as pointed out above, it is uncontested that plaintiff incurred in a series of violations involving substandard performance and lack of productivity as an OSR; and upon conclusion of a compliance investigation which indicated that she engaged in severe and gross misconduct and violation of MMM's and CMS' policies and regulations, which plaintiff had received and acknowledged.  Therefore, it is apparent the discharge did not result from the mere whim of the employer or for legally prohibited reasons, but for reasons linked to the proper and normal operation of the establishment.  So the Law 80 claim must be dismissed.

---

[35] For a detailed and comprehensive discussion of this topic, see Jorge L. Capó-Matos, in M.J. Caterine, Employment at Will: A State-by-State Survey-Puerto Rico Chapter (2011), pp. 936-969 and 2014 Cumulative Supplement, at pp. 40-15-40-22.

Carmen Rodríguez-Cardi v. MMM Holdings, Inc.
Civil No. 14-1854 (PAD)
Opinion and Order
Page 25

## IV.     CONCLUSION

For the reasons stated, MMM's motion for summary judgment is GRANTED. Plaintiff's

claims are dismissed. Judgment shall be entered accordingly.

**SO ORDERED**.

In San Juan, Puerto Rico, this 30th day of March, 2018.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO HERNANDEZ
U.S. DISTRICT JUDGE